**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br>             Plaintiff, <br><br>      v. <br><br> KLAUS HOFMANN, <br><br>             Defendant. | 21-CV-7407 (____) <br><br> **COMPLAINT** <br><br> **ECF CASE** <br> **JURY TRIAL DEMANDED** |

Plaintiff United States Securities and Exchange Commission (the "SEC") files this Complaint against Defendant Klaus Hofmann ("Hofmann"), and alleges as follows:

**SUMMARY**

1. This action concerns a multi-year expense management scheme by Kraft Heinz Company ("KHC")'s procurement division to improperly reduce KHC's cost of goods sold[1] and achieve costs savings targets that were externally touted to the market and internally tied to performance-based targets. The misconduct resulted in KHC reporting inflated earnings before interest, taxes, depreciation and amortization ("EBITDA"), a key performance metric for investors.

2. Specifically, from the fourth quarter of 2015 through the end of 2018 (the "Relevant Period"), procurement employees negotiated agreements with numerous suppliers to obtain upfront cash payments and discounts, in exchange for future commitments to be undertaken by KHC, while improperly documenting the agreements in ways that caused the company to prematurely and improperly recognize the expense savings.

---

[1] Cost of goods sold refers to KHC's direct costs of producing its food and beverage goods. This amount includes the supplier costs that KHC expends to produce its goods.

3.      In accordance with accounting principles generally accepted in the United States ("Generally Accepted Accounting Principles" or "U.S. GAAP"), if upfront cash and discounts are tied to future commitments, then the expense savings must be recognized over the period KHC performed the future obligations.  Procurement division employees, however, negotiated and maintained false and misleading supplier contracts that made it appear as if expense savings were provided in exchange for past or same-year actions performed by KHC when, in reality, they were upfront payments in exchange for a future benefit from KHC, in order to improperly recognize costs savings prematurely.

4.      Over the Relevant Period, KHC entered into approximately 59 transactions which were improperly recognized as a result of the false and misleading documentation negotiated and generated by procurement division employees.  Had these transactions been properly documented and accounted for, KHC's cost of goods sold during that period would have been approximately $50 million higher than reported in its public financial statements.

5.       These misleading transactions, along with numerous other misstated accounting entries, led KHC, in June 2019, to restate its financial statements in its annual report on Form 10-K filed with the SEC.  The restatement included financial data reported for fiscal year ("FY") 2015, as well as the financial statements contained in reports filed with the SEC on quarterly Forms 10-Q and annual Form 10-K for FYs 2016 and 2017 and the first three quarters of FY 2018 that were filed with the SEC.  KHC corrected a total of $208 million in cost savings arising from 295 transactions and also corrected its Adjusted EBITDA, as reflected in the restatement.

6.      Hofmann, KHC's Chief Procurement Officer during the Relevant Period, managed the procurement division and was responsible for, among other things, approving certain of KHC's contracts with suppliers.  In that role, Hofmann and others signed contract

approval forms for many of the improperly recognized transactions.  Hofmann also certified the accuracy and completeness of the financial statements generated by the procurement division over the first three quarters of 2018.  KHC then relied upon this sub-certification in making representations to its auditors regarding the completeness and accuracy of its financial statements.

7.      Despite numerous warning signs that should have alerted Hofmann that KHC procurement division employees were circumventing KHC's internal controls in order to achieve artificial cost savings targets in supplier contracts, Hofmann negligently approved and failed to prevent supplier contracts that masked the true nature of the transactions.  Hofmann also should have known that the false and misleading contract documentation that he negligently approved and failed to prevent was provided to KHC's finance and controller groups responsible for preparing KHC's financial statements ("controllers"), thus causing KHC to prematurely recognize cost savings in its financial statements.

8.      By engaging in the misconduct described in this complaint, Hofmann violated Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") and Section 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rules 13b2-1 and 13b2-2.  A violation of Sections 17(a)(2) and 17(a)(3) of the Securities Act does not require scienter and may rest on a finding of negligence.  *See Aaron v. SEC*, 446 U.S. 680, 685, 701-02 (1980).

9.      The SEC seeks injunctive relief, civil penalties, and other appropriate and necessary equitable relief.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.

11.     Venue is proper in this Court pursuant to Section 22(a) and (c) of the Securities Act [15 U.S.C. § 77v(a), (c)] and Section 27(a) and (b) of the Exchange Act [15 U.S.C. § 78aa(a), (b)], because certain of the acts, practices, and courses of conduct constituting the violations alleged herein occurred within the Southern District of New York.  Specifically, among other things, KHC's 2015 through 2018 financial statements, which were materially false and misleading, were available to investors in this district.

12.     Hofmann, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## DEFENDANT

13.     **Klaus Hofmann ("Hofmann")**, age 63, resides in Zug, Switzerland.  Between July 2015 and September 2019, Hofmann served as KHC's Global Head of Procurement and Chief Procurement Officer.  Hofmann left KHC in May 2020.  Prior to his employment with KHC, Hofmann was the Global Head of Procurement for H.J. Heinz Co. ("Heinz"), before Heinz merged with and into Kraft Foods Group Inc. ("Kraft") to form KHC in 2015.

## RELEVANT INDIVIDUALS

14.     The following entity, relevant to this action, has been charged by the SEC in separate actions and proceedings:

   a.   **Kraft Heinz Company (KHC)** is a publicly traded food and beverage manufacturing company co-headquartered in Chicago, Illinois, and

Pittsburgh, Pennsylvania.  KHC has a class of shares registered with the SEC pursuant to Exchange Act Section 12(b), which trades on the NASDAQ Global Select Market located in New York, NY, under the symbol "KHC."  KHC was created in July 2015 through the merger of public company Kraft with and into private company Heinz.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND

15.    Following the Kraft-Heinz merger in July 2015, newly formed KHC made concerted efforts to eliminate redundancies and reduce operational costs.  As part of its merger strategy, KHC disclosed to investors that the company would deliver on certain cost saving results throughout the company, including in the procurement division, a large cost center for KHC. The cost savings strategy, including its impact on costs of goods sold, was widely covered by research analysts at the time.  Although the company achieved the promised cost savings, individual procurement employees had key performance targets tied to additional cost savings from the procurement division.

16.    To implement this cost savings strategy, KHC set performance targets for procurement division employees tied to savings realized through negotiations with KHC's suppliers.  In the period immediately following the merger between Kraft and Heinz, these targets were generally achieved, due to, among other things, synergies from renegotiating supplier contracts in light of the newly-combined company's increased purchasing power.

17.    By 2017, however, KHC's procurement division had largely exhausted its ability to extract synergies from the merger.  In addition, the cost of many ingredient and packaging supplies increased significantly due to adverse inflation and unfavorable foreign

exchange rates.  The combined impact of the increased raw material costs and savings already realized in prior years made it more difficult for procurement division employees to achieve additional, incremental savings in 2017 and 2018.

18.      The procurement division, under Hofmann's direction and with the oversight of a more senior executive of KHC ("Senior Executive"), implemented overly ambitious annual budget and division-level savings targets, based on corporate KHC targets.  Hofmann and the Senior Executive, in turn, pushed procurement division employees to come up with ideas to generate additional immediate, same-year, savings, and did not adjust the internal targets.

## III.    KHC's EXPENSE MANAGEMENT MISCONDUCT

19.      The expense management misconduct was carried out by members of KHC's procurement division, across multiple geographic zones, and involved several strategies employed to misrepresent the true nature of transactions, resulting in accounting errors and misstatements.  Out of the 295 transactions that KHC ultimately corrected in connection with the restatement, approximately 59 were part of the procurement division's expense management misconduct, including the following types of transactions:

a    "Prebate Transactions" – KHC procurement division employees agreed to future-year commitments, like contract extensions and future-year volume purchases, in exchange for savings discounts and credits by vendors ("Prebates"), but mischaracterized the savings in contract documentation, which falsely stated that they were for past or same-year purchases made by KHC ("Rebates");

b.   "Clawback Transactions" – KHC procurement division employees agreed to take upfront payments subject to repayment through future price increases or volume commitments, but documented the transaction in ways which obscured the repayment obligation; and

c.   "Price Phasing Transactions" – Suppliers agreed to reduce their prices during a certain period in exchange for an offsetting price increase in a future period, but the full nature of the arrangement was not communicated by KHC procurement division employees to KHC controller group employees.

20.      In accordance with GAAP, KHC was required to recognize the savings provided in exchange for future commitments over the period of time that KHC performed the commitments. *See* Accounting Standards Codification ("ASC") 705-20 *Accounting for Certain Consideration Received from a Vendor*. Accordingly, when a prebate was provided in exchange for a contract extension or future-year volume commitment, the savings should have been recognized over the life of the contract extension or the future period in which KHC purchased the goods from the supplier, in accordance with GAAP. Conversely, rebate savings from past or same-year commitments should have been recognized ratably over the period in which they were earned. Finally, clawback transactions should have been recognized ratably over the clawback period—when it was reasonably estimable that KHC would satisfy its repayment obligation.

21.      Through the relevant period, KHC did not design or maintain effective internal controls for the procurement division, including those implemented by the finance and controller groups, in connection with the accounting for supplier contracts and related arrangements.

22.      Hofmann, by virtue of his role as Chief Procurement Officer, was responsible for approving certain procurement contracts on behalf of KHC. Based on his responsibilities for procurement division cost savings, his communications with the procurement employees who negotiated these improper transactions, and his communications with suppliers regarding KHC's desired accounting treatment for certain supplier transactions, Hofmann should have known that the improper procurement transactions during the Relevant Period were not properly accounted for under GAAP.

III.    **2014-2015:  Early Expense Management Misconduct**

23.      In the months leading up to the merger with Kraft in July 2015, the procurement division of Heinz was faced with a $10 million year-end cost savings gap. As a result, members

7

of the procurement division and Hofmann, who worked at Heinz at the time, took steps with regard to a previously negotiated transaction with a packaging supplier that led KHC's improper recognition of additional cost savings in 2015.

24.     The original letter of intent agreement with the packaging supplier, which Hofmann signed in 2014 on behalf of Heinz, provided that the supplier would make a $3.5 million upfront payment (commonly referred to as a "prebate") to Heinz in exchange for the parties' signing a new three-year contract in 2015.  The letter of intent further stated that the supplier was not obligated to pay the $3.5 million prebate if the parties failed to execute the new contract.  Consistent with this language, Hofmann delivered a presentation in January 2015 to the Senior Executive (then at Heinz) communicating that cost savings from the $3.5 million prebate transaction was linked to the three-year period covered by the new contract.

25.     A few months later, Hofmann presented a planning document to the Senior Executive stating that Heinz was in the process of negotiating a new contract with the supplier to generate "improved, backdated impact for CY15" in the form of a "rebate."  The document stated that the parties needed to "align on wording," without which the company could "book only 1/3 of benefit" in 2015.  Hofmann also met with the CEO of the supplier in order to determine if the supplier would be "open to reword" the description of the payment to "allow [Heinz] to book" the full "3,5 Mi[llio]n USD into 2015" and discussed internally that wording of the $3.5 million payment that would enable Heinz to improperly book the amount in 2015.

26.     In late 2015, following the merger, KHC renegotiated language with the same supplier describing the $3.5 million prebate, entered into a new contract with the supplier characterizing the payment as "a non-refundable 2015 payment . . .  for purchases made in 2015," and prematurely recognized the cost savings in 2015.  This accounting treatment was

improper and violated GAAP because the final contract, which Hofmann approved and signed, mischaracterized the true nature of the supplier payment by not disclosing the fact that the $3.5 million prebate payment remained linked to a three-year contract.

27.    Finally, Hofmann and the Senior Executive understood that a final board presentation regarding procurement, unlike prior drafts, did not contain details surrounding the $3.5 million prebate payment from the supplier.

28.    In a separate transaction involving the same supplier, Hofmann and the Senior Executive discussed the restructuring of a $2 million retention bonus that the supplier had awarded to Kraft before the merger, in order for newly merged KHC to recognize the full amount in 2015, resulting in a credit to the savings targets of Heinz procurement personnel.  The Senior Executive and Hofmann had access to information that was not communicated to the controller group that would have caused the controller group to question whether immediate recognition of the $2 million was appropriate.  In this transaction, procurement division employees negotiated two new contracts with the supplier—one in which Kraft returned the bonus back to the supplier, and another, in which the supplier re-conveyed the $2 million rebate, but this time, to Heinz, and purportedly in exchange for purchase volumes in 2015. Recharacterizing the $2 million retention bonus as a supposed purchase volume rebate enabled KHC to improperly recognize the full $2 million in 2015.  The Senior Executive and Hofmann were provided a global operations presentation that discussed the transaction as part of a plan to recognize cost savings in 2015, but did not take steps to address whether the rebate was accurately reflected in the new contract with Heinz.

29.    These rebate transactions from Heinz and the early months of KHC following the merger should have placed Hofmann and the Senior Executive on notice that procurement

division employees were misrepresenting the true economic nature of rebate transactions. Specifically, Hofmann was provided with information that should have put him on notice of the importance of not linking payments from suppliers to future contract obligations in order to achieve premature costs savings.

30.     For instance, in another pre-merger transaction involving a potato supplier, Heinz's procurement division tried to improperly recognize $10 million in cost savings in 2014 by drafting side credit notes which improperly characterized a $10 million supplier payment as being provided in exchange for past purchases rather than for the new multi-year contract (the real reason for the $10 million payment).  Although this payment was ultimately recorded correctly—and spread over the life of the contract—Hofmann and the Senior Executive should have understood through this transaction that before the merger, Heinz's controllers were being presented agreements with vendors that mischaracterized the true nature of the transactions.  In an email communication, for example, Hofmann informed the Senior Executive of the need to align on a "story" that Heinz procurement personnel would tell Heinz's global controller regarding the purpose of the supplier payments and the importance of not linking payments from suppliers to future obligations.

## IV.    2017-2018:  KHC Expense Management Misconduct Continues

31.     Beginning in 2017 and continuing into 2018, KHC encountered significant headwinds in its effort to meet annual budget and savings targets, principally due to inflation and unfavorable foreign exchange rates, the exhaustion of merger-related savings, and the incremental, year-over-year nature of the procurement division savings targets.  The expense management misconduct was more limited in 2016 because the procurement division exceeded its gross savings targets that year.  In 2017 and 2018, members of the procurement division—

across multiple geographic zones—manipulated 54 supplier transactions (out of approximately 59 during the Relevant Period) to improperly obtain premature recognition of cost savings.

**V.    Hofmann Negligently Approved And Failed To Prevent Supplier Contracts For Transactions That Did Not Reflect True Rebate Terms, Resulting In Misstated Financial Statements**

32.    Hofmann and the Senior Executive had access to information, including from his involvement in the earlier transactions described above, that should have alerted them to the fact that certain contracts with suppliers submitted by procurement division employees to KHC's controllers did not reflect the true nature of the underlying agreements and would result in improper accounting treatment.  Similarly, Hofmann was negligent in not preventing members of the procurement division from entering into certain agreements with suppliers that did not generate any new costs savings, despite purported cost savings being reflected in the company's accounting books and records and public disclosures.

33.    In 2017, for example, procurement division employees negotiated a $2 million prebate to KHC from a sugar supplier in exchange for a three-year contract extension and future sugar purchases.  In addition, the agreement called for KHC to return the $2 million back to the supplier in the form of paying higher prices for sugar over the three-year period.  Thus, the agreement did not produce any actual cost savings.  Hofmann and the Senior Executive should have known the true structure of the transaction, including through their participation in monthly performance reviews, during which it was disclosed that the $2 million was tied to a contract extension and future volume purchases, even though KHC improperly recognized the full cost savings in August 2017.

34.    Hofmann also provided the Senior Executive a "risk mitigation plan," which listed $2 million in 2017 savings from the transaction and identified three other transactions that

were part of the expense management misconduct.  Hofmann highlighted in the email that he would "need to find a way to make them count in 2017 by getting them signed off by the controllers."

35.     In 2018, the agreement with the sugar supplier was extended to provide KHC with more time to repay the supplier for the 2017 prebate, through inflated sugar prices.  To accomplish this, KHC was given an immediate sugar price reduction, but later in the year, the inflated prices resumed, and thereafter, continued over a longer future period in order to effectuate full repayment.  However, KHC recognized an immediate price reduction of $500,000 as purported new cost savings.  Hofmann was informed of the deal's structure, and both Hofmann and the Senior Executive received presentations communicating the anticipated and improper 2018 savings recognition.

36.     In 2017 and 2018, KHC's procurement division entered into additional agreements with suppliers which provided KHC with upfront payments that were recognized prematurely, even though they were tied to future commitments and allowed the suppliers to "clawback" an agreed-upon percentage of the upfront prebate.  In one such transaction, Hofmann was sent a presentation reflecting that KHC obtained a $4 million price reduction and $7.5 million in other efficiencies in exchange for committing to a new contract with a "5 year term" for the purchase of new cardboard grades from the supplier, and the supplier could "claw back a portion if any of the implementation is delayed after 2018."  According to the presentation provided to Hofmann, the supplier could recoup the prebate through increased pricing for 2019 KHC purchases.

37.      Hofmann acknowledged that the cost savings from the agreement would be "booked in July [2018]" in his self-evaluation that he provided to the Senior Executive in

connection with his performance review.  He also was informed by one of his subordinates that there was potential "upside in the year [] if we get the wording correct[]."  Thereafter, Hofmann had a call with the CEO of the supplier, during which they discussed contract wording for the two supplier payments which did not link either of the payments to a contract extension or a clawback obligation.  Hofmann approved the final contract, which did not reflect the true nature of the transaction because it did not link KHC's future payment obligations or the supplier's right to clawback the prebate, while understanding that KHC's controllers would rely on the contract to make an accounting determination.

38.     Thereafter, Hofmann signed, and along with the Senior Executive, submitted a sub-certification of the accuracy and completeness of the financial statements generated by KHC's procurement division over the first three quarters of 2018, during which the majority of the savings from this transaction were improperly recognized.  KHC then relied on this sub-certification to prepare representations to its auditors regarding the completeness and accuracy of its financial statements.

39.     Hofmann also approved "price phasing" supplier transactions, which created the illusion of immediate cost savings through price decreases from suppliers, but, in reality, were structured to include an offsetting price increase later in time.  These "price phasing" transactions violated GAAP because they purported to recognize cost savings that did not exist.

40.     In 2017, for example, Hofmann unreasonably did not prevent the execution of a transaction in which KHC improperly reduced its costs by $600,000 in earlier quarters through a price phasing deal with a sugar supplier.  The transaction produced no real savings, however, because it required KHC to remit the same amount back to the supplier in the form of

higher pricing in later quarters within the same year.  In connection with this deal, Hofmann was aware that his team was contemplating sugar pricing strategies to address pressures from the Senior Executive to narrow the gap between forecasted and expected expenses to date. Hofmann and the Senior Executive also reviewed presentations highlighting that the $600,000 in positive impact to KHC's budget was tied to "sugar price phasing."  Similarly, a draft presentation that Hofmann reviewed in advance of a trip he took with the Senior Executive to visit the supplier highlighted that the deal would "[m]ove some negative impact from Q1 CY17 through price phasing."

41.     The improper recognition of savings for the 59 transactions caused KHC to issue materially false and misleading financial statements in reports filed with the SEC on annual Forms 10-K for FYs 2015, 2016 and 2017, on Forms 10-Q for the quarterly periods in FYs 2016 and 2017 and the first three quarters of FY 2018, and on summary KHC financial data for the fourth quarter of 2018 furnished to the SEC on Form 8-K.  By improperly recognizing savings from the 59 transactions, the financial statements falsely and materially underreported KHC's costs of goods sold during the Relevant Period.

**VI.     Hofmann's Internal Accounting Controls and Books and Records Violations**

42.     Hofmann knew or should have known about the following KHC internal accounting controls, which included: (i) the preparation and signing of contract approval forms which were required to communicate the key commercial terms of procurement transactions to the controllers, (ii) the review of contract documentation and contract approval forms by KHC's controllers, and (iii) the completion of accurate sub-certifications affirming that there were not material transactions, agreements, or accounts that had not been properly recorded in KHC's accounting.

14

43.     Hofmann's approval of supplier agreements and signing of the inaccurate 2018 sub-certification violated Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2 thereunder.

## TOLLING AGREEMENTS

44.     Hofmann and the SEC entered into tolling agreements suspending the running of any applicable statute of limitations from December 7, 2020 through April 5, 2021; from April 6, 2021 through July 8, 2021; and from July 9, 2021 through September 10, 2021.

### COUNT I
### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### (Negligence-Based Fraud)

45.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 44.

46.      Hofmann, in connection with the offer to sell or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly and with negligence, obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and negligently engaged in a transaction, practice, or course of business which operated or would have operated as a fraud or deceit on purchasers of KHC's securities.

47.     KHC issued debt in securities offerings during the Relevant Period, the offerings for which incorporated by reference the inaccurate financial reports that were later restated, and offered the Senior Executive and Hofmann, among other employees, stock options and other stock-based compensation during the relevant period, and bonus compensation that

15

was tied to their success at generating supply chain and operational cost savings. Specifically, the bonus criteria given the largest weight for Hofmann was reaching a metric referred to as a purchase price variance target that was based on the amount of year-over-year savings the procurement division obtained from its supplier contracts. Similarly, the Senior Executive was assigned responsibility for operational costs, which not only were a key factor in determining the company's annual budget, but were also directly impacted by the year-over-year savings achieved by the procurement division.

48.    By engaging in the conduct described above, Hofmann violated, and unless restrained and enjoined will again violate, Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2), (3)].

**COUNT II**
**Violations of Rule 13b2-1 of the Securities Exchange Act**
**(Books and Records)**

49.    The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 48.

50.    Section 13(b)(2)(a) of the Exchange Act [15 U.S.C. § 78m(b)(2)(a)] requires issuers of registered securities make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. Rule 13b2-1 [17 CFR § 240.13b2-1] issued thereunder prohibits any person from directly or indirectly falsifying, or causing the falsification of, any book, record, or account required by Section 13(b)(2)(A).

51.    By engaging in the conduct described above, Hofmann violated, and unless restrained and enjoined will again violate, Rule 13b2-1 of the Exchange Act [17 CFR § 240.13b2-1].

**COUNT III**
**Violations of Rules 13b2-2 of the Securities Exchange Act**
**(Directly or Indirectly Making False Statements to Accountants and Auditors)**

52.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 51.

53.     Exchange Act Rule 13b2-2 prohibits an officer or director of an issuer from, among other things, making or causing to be made a materially false or misleading statement to an accountant in connection with any required audit of the issuer's financial statements or the preparation of a report required to be filed with the Commission.

54.     By engaging in the conduct described above, Hofmann violated, and unless restrained and enjoined will again violate, Rule 13b2-2 of the Exchange Act [17 CFR § 240.13b2-2].

**COUNT IV**
**Violations of Section 13(b)(5) of the Securities Exchange Act**
**(Internal Controls)**

55.     The SEC realleges and incorporates by reference here the allegations in paragraphs 1 through 54.

56.     Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] prohibits individuals from knowingly circumventing or knowingly failing to implement a system of internal accounting controls or knowingly falsifying any book, record or account.

57.     By engaging in the conduct described above, Hofmann violated, and unless restrained and enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court enter a Final Judgment:

A.  Finding that Hofmann violated the federal securities laws alleged in Counts I through IV of the Complaint;

B.  Permanently restraining and enjoining Hofmann from violating the federal securities laws alleged in the Complaint;

C.  Ordering Hofmann to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

D.   Ordering that Hofmann be barred from acting as an officer or director of any public company pursuant to the Court's inherent equitable authority and Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

E.  Granting such other and further equitable relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the SEC hereby demands trial by jury.

Dated:  September 3, 2021                 Respectfully submitted,

/s/ James P. Connor
James P. Connor*
Attorney for Plaintiff
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street NE
Washington, DC 20549
Tel: (202) 551-8394
Email: connorja@sec.gov

*Pending admission pro hac vice

18

<u>Of counsel:</u>
Seth M. Nadler
Thomas B. Rogers
100 F Street NE
Washington, DC 20549